## Richmond

APPALACHIAN POWER COMPANY v. JAMES ROWE ANDERSON, ET AL.

March 6, 1972.

Record No. 7631.

Present, All the Justices.

*Emmitt F. Yeary* (*John A. Blakemore; Blakemore & Yeary*, on brief), for plaintiff in error.

*George M. Warren, Jr.* (*Warren & Bowie*, on brief), for defendants in error.

HARRISON, J., delivered the opinion of the court.

Appalachian Power Company appeals a final order of the trial

court confirming an award by commissioners of $20,000 to James Rowe Anderson and Vivian J. Anderson, his wife. The award represents compensation for a transmission line right-of-way easement across the Anderson property, together with right of ingress and egress to and from the right-of-way over an existing road on the property of appellees.

The Andersons own a 31 acre parcel of land located on the south side of Highway 609, known as the Hillman highway, about one mile from the town of Abingdon in Washington County. The land fronts on the highway a distance of approximately 700 feet and runs back therefrom in a southerly direction.

The extreme north portion of the Anderson land which abuts the highway, 4.58 acres, is developed as a trailer park. At the time of the take by Appalachian 31 of the 42 then existing and developed trailer spaces were occupied. The remaining 26.42 acres lying immediately to the south of the trailer park are unimproved except for farm type fencing and a farm pond.

Appalachian, pursuant to Code §§ 25-46.1 through 25-46.29, sought a right-of-way easement through the unimproved portion of the Anderson property. The easement, 60 feet wide and 744 feet in length, traverses the property in a general east-west direction and is roughly parallel to the highway. The right of ingress and egress sought to and from the right-of-way is over an existing 18-foot road which begins at the highway and runs in a general southeasterly direction 415 feet across the 4.58 acre parcel to the right-of-way easement.

The petition for condemnation was filed on August 27, 1969. The matter was heard by commissioners on February 2, 1970 and they awarded the landowners $20,000, of which $6,000 represented the value of the land taken and $14,000 represented damages. Exceptions were filed to the report of the commissioners and overruled. Final judgment was entered by the court below on July 20, 1970.

Appalachian contends that it was prejudiced by the rulings of the trial court in the following particulars: The trial court permitted the landowners to introduce a map reflecting their plans for the future development of the property across which the right-of-way was sought. It permitted witnesses for the landowners to use the capitalization of income method of appraising real estate to arrive at the value of the landowners' property. And it refused to permit the introduction of evidence of a public auction sale of adjoining com-

parable property as evidence of the fair market value of the Anderson property.

The three witnesses called by Appalachian to establish fair market value of the easement taken and damage to the residue, estimated such value and damages at $4,250, $5,430 and $5,010 respectively.

Appalachian attempted to show the sale price of a parcel of land known as the Minnick property, which also fronts on Hillman highway and adjoins the Anderson land on the east. The court ruled that it was not comparable property since it had no "trailer court on it".

Subsequent to the filing of Appalachian's petition for condemnation the Andersons employed A. L. Cumbow, Jr., a surveyor, to subdivide and plat their property, and to show thereon trailer parking sites reflecting the landowners' plans for future development. Cumbow's plat reflects a total of 90 trailer spaces of which 42 are shown as existing and 48 are shown as representing future "expansion". The area to be traversed by Appalachian's line is subdivided into 16 trailer site lots, all numbered and delineated by metes and bounds, and all shown as fronting on driveways.

The 48 additional trailer spaces, which include the 16 within the take, were nonexistent at the time Appalachian filed its petition for condemnation, and at the time of the trial. In fact, the subdivision itself was nonexistent when the proceeding was instituted except for the 42 trailer sites which had been laid out by the Andersons but not platted. The proposed power line did not cross any of these sites.

Cumbow testified that his scale drawing depicted the appellees' planned expansion of their properties as they had described it to him. He was asked: "Mr. Anderson told you Appalachian Power Company was coming in and he wanted a map made?" Cumbow responded: "Yes, sir."

The landowners called Robert L. Shipley and Vivian J. Anderson to establish value and damages. Shipley's testimony was based on the "capitalization of income method". He obtained information from the Andersons of their income from the operation of 24 trailer park sites that existed in 1968. By using a rental price of $20 a month per space for a period of 12 months, he arrived at a gross annual rental of $5,760. He then estimated a 10% vacancy, allowed for expenses of operation and management and found a net income of $2,884. After allowing $1,127 for depreciation he assumed a net income of $1,656, which he capitalized at 9% and testified this gave him a value

of $18,380 for the 24 units that were in operation, or a value of $765 per trailer space. He said the units cost the Andersons $16,750.

Shipley then testified, referring to the subdivision plat that Cumbow had made, that 16 trailer lots were taken by the power line easement having a value of $765 each, totaling $12,240. He valued ingress and egress rights taken over the existing road at $2,000. He testified that 8 additional lots of the subdivision had been damaged to the extent of 40% of $765 each, or $2,450. He also added on 5% damage for unsightliness, the undesirability of having a power line across the property and the psychological effect it would have on prospective renters. His total estimate of value and damages to the residue amounted to $19,290.

Mrs. Anderson testified that the value of the property taken and damages to the residue aggregated $37,696. She said that she also based her estimate on the capitalization of income method. However, in arriving at her estimate she used $960 per trailer unit instead of the $765 figure used by Shipley. She capitalized net income at 10%.

[■] The principles governing the taking of property in condemnation cases have been repeatedly enunciated and are well established. The measure of compensation for property taken is the fair market value of the property at the time of the taking. The true test of damages to the residue of the land not taken is the difference in value before and immediately after the taking, and in ascertaining such damages there may be considered every circumstance, present or future, which affects its value. Remote and speculative profits and advantages are not to be considered in either instance. It is the present actual value of the land with all its adaptations to general and special uses, and not its prospective, speculative or possible value, based on future expenditures or improvements, that is to be considered. Compensation should be awarded upon the basis of the most advantageous and valuable use of the land, or, stated differently, its highest and best use, having regard to the existing business demands of the community or such as may reasonably be expected in the near future. Compensation must be a full and perfect equivalent for the property. See *Appalachian Elec., Etc., Co.* v. *Gorman*, 191 Va. 344, 61 S. E. 2d 33 (1950) and authorities therein cited.

The Andersons contend that the highest and best use for that portion of their 31 acre tract of land through which Appalachian seeks to condemn an easement for a power line is for the future expansion of their trailer park. It is proper for the landowners to introduce

testimony to establish this fact, and to show by competent evidence all factors which render the land suitable for the location of additional trailer sites.

However, it is clear that the platting and subdividing of this vacant and unimproved property into lots with driveways to show its present market value was not proper. The Cumbow plat was prepared after the condemnation proceeding had been instituted by Appalachian. It shows lots, streets, and a development which did not exist at the time of Appalachian's take. The property had not then been subdivided, utilities had not been run to the proposed future trailer sites and streets and driveways had not been laid off. It was not then a trailer park subdivision.

It is further observed that the Cumbow map did not correctly portray all existing facts. A barn structure located on at least two of the proposed lots was not shown. The existence of a 7,200 volt service line across the property was ignored. The trial judge noted that a certain driveway which he saw at the time of the view was not reflected on the map. He observed: "Gentlemen, if the map showed what was actually there, the court would let it go in, but you don't. Do you have a map that shows the situation as it now exists?" Notwithstanding that, he then ruled: "All right, Gentlemen, let the map go in. I don't know whether the Court is right or not, but it is a developed trailer park up to the proposed right of way."

Appellees rely on *Gorman, supra*. That case was decided in 1950. It involved a condemnation proceeding by Appalachian for a power transmission line over a 43.5 acre parcel of land located about ¼ of a mile from the City of Lynchburg. The land was described as suitable for a high class subdivision for persons desiring to build expensive residences, and by one witness as being "as fine a piece of property for subdivision as I have seen anywhere in the United States". The land had been held by the owners intact without buildings. In 1940 the owners employed a landscape architect to plat the tract into 100 lots and streets. The land was cleared for prospective purchasers to obtain a good view of the subdivision. Trees were planted according to the plan. Water and sewer lines were mapped and bids obtained. Plans for a sale were temporarily halted during World War II. The court found that the map was not made for the purpose of boosting the value of the tract but for a development prevented by circumstances beyond the control of the landowners. It admitted the plat as being "useful and material in illustrating how the taking of the

easement and the construction and operation of the power line changed the present and immediate situation with respect to the development of the tract and thereby affected both the present and immediate future use of the entire tract". 191 Va. 356-57, 61 S. E. 2d 39.

In the instant case we not only have a plat that does not reflect all existing conditions, but a plat, made subsequent to the filing of the condemnation suit, which subdivides into specific lots land embraced within the easement sought by Appalachian.

In *Richmond & P. R. Co.* v. *Seaboard, &c., Co.,* 103 Va. 399, 407, 49 S. E. 512, 515 (1905) this court held:

"It is the present actual value of the land with all its adaptations to general and special uses, and not its prospective, or speculative, or possible value based upon future expenditures and improvements that is to be considered.

"In the case of *Schuylkill Run, &c. R. R. Co.* v. *Stocker,* 128 Penn. 233, 18 Atl. 399, it was held, that the jury was not to value the tract upon the theory of what it might bring platted and divided up into building lots; that they were to enquire what a present purchaser would be willing to pay for it in its present condition, and not what a speculator might be able to realize out of a re-sale in the future. [Citing cases.]"

In *Appalachian Pr. Co.* v. *Johnson,* 137 Va. 12, 26, 119 S. E. 253, 257 (1923) the landowner introduced evidence that he contemplated having part of the land involved laid out into town lots. The court said:

"Where the property and property rights proposed to be taken have a present fair market value, that value, at the time of the taking, is the 'just compensation' to which the owner is entitled under the constitutional provisions on the subject, and is the measure of the award the commissioners should make to the owner therefor; and not the value after future development of the property, or in the vicinity of it, has been made. [Citing cases.]"

In *Barnes* v. *N. C. State Highway Commission,* 250 N. C. 378, 109 S. E. 2d 219 (1959) the landowner introduced maps to illustrate and explain a witness' testimony that his land was capable of and

adaptable to a residential subdivision. The trial court excluded testimony of the value of the land based on the proposed subdivision. This ruling was affirmed on appeal and it was held:

"It is proper to show that a particular tract of land is suitable and available for division into lots and is valuable for that purpose, but it is not proper to show the number and value of lots as separated parcels in an imaginary subdivision thereof. In other words, it is not proper for the jury in these cases to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. Such undeveloped property may not be valued on a per lot basis. The cost factor is too speculative. [Citing authorities.]" 250 N. C. 388-89, 109 S. E. 2d 228.

See also 6 Mich. Jur. *Eminent Domain* § 42 (1949); 27 Am. Jur. 2d *Eminent Domain* § 435 (1966); and Annot. 26 A. L. R. 3d 780 § 2a (1969); *State Road Commission* v. *Ferguson*, 148 W. Va. 742, 137 S. E. 2d 206 (1964).

We can envision a case where the suitability of land for a specific purpose might be an issue and where a plat showing how the land could be subdivided into lots would be admissible for that purpose. But that is not the instant case. It does not appear that Appalachian seriously controverts the suitability of the undeveloped portion of the Anderson land for future trailer sites. Here the map, showing this land as subdivided, was used by the witnesses to refer to specific lots and to point out how and the amount by which they were damaged. In essence appellees treated the affected land embraced within the take as divided into lots when in fact it is undeveloped acreage. Their witnesses, in computing value and damages, did so on the value of the hypothetical and nonexisting lots, rather than on the tract as a whole. The admission of the plat, and the admission of evidence based thereon, constitutes reversible error.

Since this case may be retried we must consider appellant's other assignments of error. The capitalization of income method of appraisal is used where income producing property is condemned and it becomes necessary to ascertain its value. After taking into consideration investment, depreciation, operating expenses and other proper items, the net income therefrom capitalized at a reasonable figure is proper evidence to be considered in fixing value.

However, in the instant case we are not dealing with income pro-

ducing property but unimproved acreage suitable to be developed. Here the witnesses for the landowners used the income derived during 1968, two years prior to the take, and on the 24 units which then existed. The appraiser assumed a 10% vacancy. At the time of the trial only 31 of 42 of the trailer spaces were occupied—a vacancy rate of 25%. He further assumed, despite the factors of inflation and increased development and construction cost, that income to be derived in the future from the undeveloped lots would be the same as that on lots that had been developed and were being used as sites in 1968. Why witness Shipley selected 9% and Mrs. Anderson selected 10% as their respective capitalization rates is not shown.

In *United States* v. *Whitehurst*, 337 F. 2d 765 (4th Cir. 1964) the court held the capitalization of income method of determining the value of land should not be used where the determination is based upon pure speculation and is without objective evidential support. It held that capitalization of income comprehends the use of a rate of return in comparable investments. Evidence of rate of return that is in no way related to a comparable investment does not meet this requirement.

Capitalization of income would have been a proper method for the appraiser to have used in determining the fair market value of the existing 24 trailer sites, assuming that he used correct and accurate information as to cost, expenses, depreciation, remaining life of property, percentage of vacancy and rate of return. However, it is clear that the value of the unimproved land of the Andersons could not be related to, or compared with, the capitalized income derived from the completed and existing sites.

Shipley, in testifying that each hypothetical lot that could be located on Appalachian's take would have the same value as an existing lot, was in effect basing its value on future or prospective uses to which the land may be applied, predicated on speculation or conjecture. The evidence of witnesses Shipley and Mrs. Anderson as to values based on the capitalization method was improperly admitted.

Appalachian also complains of the action of the court in refusing to permit it to introduce evidence as to a recent sale made of property which it represents is comparable to the Anderson property.

The property in question is identified as the Minnick tract which adjoins the Anderson property on the east, and which also fronts on the south side of the Hillman highway. While the Minnick property has not been used as a trailer park its general topography was testi-

fied to be the same as the Anderson land. The Minnick property was sold at public auction 51 days before the date on which this proceeding was heard in the court below. Appalachian contends that it is comparable property and that it should have been permitted to show this fact. The trial court ruled the evidence inadmissible, assigning as a reason that there was no trailer court on it.

We have recently considered the admissibility of a sale at public auction to show comparable market value. In *Tremblay* v. *Highway Commissioner*, 212 Va. 166, 183 S. E. 2d 141 (1971) we reiterated that "market value is the price which one, under no compulsion to sell, is willing to take for property and which another, under no compulsion to buy, is willing to pay" and further said:

"In many sales at auction, there is present an element of legal compulsion which negates the idea of a free and voluntary transaction and which rebuts the probability that fair market value has been paid and received. This necessitates a rule, which we now adopt, excluding evidence of sales at auction under foreclosure proceedings or similar forced circumstances.

"Doubtless, however, there are other sales at auction where the element of compulsion is lacking. In a given case, it might be shown that the circumstances under which the property was sold were free and open and produced a sale price reflecting market value. If these elements of voluntariness and fairness can be shown to the satisfaction of the trial court by the party offering the sale, upon whom the burden rests, in a hearing conducted out of the presence of the commissioners, then evidence of such a sale should be admitted." 212 Va. 168, 183 S. E. 2d 144.

In the instant case the nature of the public auction sale of the Minnick property was not shown. We are unable to determine from the record whether or not it was a comparable sale, for Appalachian was precluded from developing the facts. The mere fact that it was an auction sale does not necessarily exclude it under the forced circumstances rule provided the voluntariness and fairness of the sale is shown. Whether or not properties are comparable depends upon many factors. Obviously the properties involved here are comparable in many aspects.

We conclude that the court erred in not permitting Appalachian to introduce evidence to show that the Minnick property was com-

parable property to that of the Andersons. It should have been permitted to show that the element of compulsion was lacking, and that the circumstances under which the property was auctioned were free and open and produced a fair price reflecting market value. If Appalachian establishes these factors and that the properties are comparable, the evidence is proper to be considered by the commissioners.

We further hold that the mere absence of an established or existing trailer court does not of itself prevent property from being suitable for the location of such a court, or from its being comparable to property on which there is an existing court. The factors which determine the suitability and adaptability of land for use as a trailer court are many and varied.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

CHIEF JUSTICE SNEAD and JUSTICES I'ANSON, CARRICO and GORDON concurring in result.

We concur that the judgment of the trial court should be reversed and the cause remanded for a new trial but we do not accept all the views expressed in the basic opinion. We agree that because the Cumbow map did not portray all existing conditions, it should not have been admitted in evidence. However, we would make it clear that but for the inaccuracy of the plat, a majority of the Court would approve its admission into evidence. Since it was shown that the highest and best use of the landowners' property was for expansion of their trailer park, it would have been proper for them to prepare and introduce an accurate map of their property showing its potential and suitability as a subdivision for trailer sites and showing that the undeveloped portion thereof could be integrated into that portion which had been previously subdivided. Such an accurate map would have been admissible for the sole purpose of showing that the present value of the acreage involved was affected by its adaptability to and its availability for that highest and best use. We agree with our brethren that even if accurate, the map could not have been used for valuing the property taken or assessing damages to the residue on a per lot basis. *United States* v. *Coronado Beach Co.*, 255 U.S. 472 (1921); 5 *Nichols, The Law of Eminent Domain*, § 18.11[2] (rev. 3d ed. 1969).