Present: Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Lemons, JJ., and Whiting, S.J.

JOHNNY C. RUSSELL, ET AL.

                                      OPINION BY
v. Record No. 001558     SENIOR JUSTICE HENRY H. WHITING
                                     April 20, 2001
COMMONWEALTH TRANSPORTATION
COMMISSIONER OF VIRGINIA


                FROM THE CIRCUIT COURT OF LEE COUNTY
                       Ford C. Quillen, Judge

     The issue in this case is the admissibility of a prior tax

evaluation of property being condemned to impeach the

credibility of the property owners' appraiser.

     The Commonwealth Transportation Commissioner (the

Commonwealth) filed eminent domain proceedings to acquire a

39.125-acre parcel of land owned by Johnny C. and Phyllis

Russell (the Russells) in Lee County.  At trial, the Russells

sought to qualify Ed Stacy, the sole proprietor of a real estate

appraisal firm, a certified general real estate appraiser, and

tax assessment evaluator, as an expert witness familiar with the

value of real estate in Lee County.

     In attempting to establish his general knowledge of Lee

County real estate values on September 27, 1996, the date of the

condemnation, Stacy testified on direct examination that he and

members of his firm had been "involved" in the 1996 Lee County

tax reassessment.  Stacy said that in order to make the

reassessment, they conducted a study of all real estate sales in

Lee County during 1995 and the first half of 1996, after which they valued real property in the county.

Stacy further testified that approximately three years later, he appraised the Russells' condemned property to determine its fair market value as of September 27, 1996. Stacy stated that on that date the fair market value of the 39.125-acre parcel was $12,538 per acre. During the Commonwealth's cross-examination of Stacy, it sought to elicit, as impeachment evidence, testimony from Stacy concerning his firm's earlier tax valuation of the 39.125-acre parcel at $1,000 per acre. The Russells objected to this line of questioning, asserting that evidence concerning tax assessments was not relevant in a condemnation proceeding.

During argument on this objection, counsel for the Russells did not disagree with the statements of the trial court and the Commonwealth's counsel that Lee County real estate tax appraisals were at the 100 percent rate of fair market value. Instead, counsel responded that Stacy could explain the difference in the two appraisals of the 39.125-acre parcel. The trial court overruled the Russells' objection and allowed the questioning for purposes of impeachment. Stacy then explained that the appraiser in his firm who performed the tax assessment valuation "had no way of knowing that this piece of property actually was part of or previously a part of a much larger

property that was right across from where this four-lane [highway] was going into[,] which would significantly [a]ffect this piece of property." Stacy also stated that the appraiser "most likely . . . had no aware[ness] of this scenic easement that was placed on the property." Stacy further explained that based on these considerations, "that's where the $1,000.00 an acre [in the tax evaluation] came from."

At the conclusion of the trial, the commissioners returned a report valuing the condemned parcel at $5,140 per acre. Overruling the Russells' exceptions to the commissioners' report, the trial court entered an order confirming the report.

On appeal, the Russells argue that the trial court abused its discretion in allowing the Commonwealth to cross-examine Stacy concerning his firm's valuation of the property for tax assessment purposes. The Russells assert that "[r]eal estate tax assessments are generated for reasons wholly unrelated to the criteria which govern eminent domain proceedings" and that the purpose of this type of valuation, to determine relative property values, is fundamentally different from the purpose of an appraisal in a condemnation proceeding, which is to compensate landowners fully for the loss of their property. Thus, the Russells contend that evidence of tax valuations was improper impeachment evidence regarding Stacy's valuation of the property to determine just compensation.

3

In response, the Commonwealth argues that the trial court properly allowed Stacy to be cross-examined concerning his earlier valuation of the property, because that valuation was a prior inconsistent statement made by Stacy and his firm about the value of the condemned property. Thus, we consider whether the prior valuation of the Russells' land made for tax assessment purposes presented an inconsistency bearing on the credibility of Stacy's valuation testimony at trial.

Fundamental principles govern this issue. In Virginia, real property is to be appraised or evaluated at its fair market value when fixing the amounts to be paid as just compensation in condemnation cases and when determining what amounts will be paid as real estate taxes. See Lynch v. Commonwealth Trans. Comm'r, 247 Va. 388, 393, 442 S.E.2d 388, 389, 391 (1994) (condemnation); Va. Const. art. X, § 2; Code § 58.1-3201 (tax purposes). In certain instances, uniformity considerations might affect tax assessments because Article X, § 1 of the Virginia Constitution requires "uniform[ity] upon the same class of subjects within the territorial limits of the authority levying the tax." Uniformity considerations are usually involved when multiple or different methods were used by the taxing jurisdiction to determine the fair market value of various properties within a class of properties. Cross v. City of Newport News, 217 Va. 202, 206, 228 S.E.2d 113, 116 (1976);

4

Skyline Swannanoa v. Nelson County, 186 Va. 878, 881, 44 S.E.2d 437, 439 (1947).

A second fundamental consideration is that the credibility of a witness may be impeached by showing that the witness made statements on a prior occasion that are inconsistent with his present testimony. Breeden v. Roberts, 258 Va. 411, 415-16, 518 S.E.2d 834, 837 (1999). And, we said in Spruill v. Commonwealth, 221 Va. 475, 485, 271 S.E.2d 419, 425 (1980):

> [The] determination of the scope of cross-examination in general, and of the extent of testimonial impeachment in particular, should be "left largely to the sound discretion of the trial court; and the rule is well established that an appellate court will not interfere, unless that discretion has been plainly abused." (Citation omitted.)

In applying these principles to the facts in this case, we note that the record does not indicate that the tax evaluations made by Stacy's firm for the 1996 Lee County reassessments were based on any other consideration than that of fair market value. In fact, when Stacy attempted to explain the inconsistency in the two appraisals, he mentioned only his tax appraiser's ignorance of two factors that Stacy said would have affected the appraiser's evaluation of the fair market value of the 39.125-acre parcel. Not only is there no evidence that uniformity considerations or different methods of evaluation affected the tax evaluations made by Stacy's group of the 39.125-acre parcel, but neither Stacy nor the Russells claim that either of these

considerations had any effect on Stacy's firm's 1996 Lee County tax assessments.

Thus, there appeared to be an inconsistency in Stacy's testimony of the September 25, 1996 value of the 39.125-acre parcel at $12,538 per acre and his firm's evaluation of the same property for the tax year 1996 at $1,000 per acre. Given (1) the wide disparity in the appraisals; (2) Stacy's use of his firm's 1996 sales studies for the tax appraisals to establish his general knowledge of Lee County real estate; and (3) Stacy's testimony that these tax sales studies "had a bearing" on his opinion of the value of the 39.125-acre parcel, we think that the prior tax evaluation could have been considered by the condemnation commission to properly assess the weight of Stacy's expert testimony. Hence, we find no abuse of the trial court's discretion in permitting this impeachment evidence on cross-examination.

Accordingly, the judgment of the trial court will be

Affirmed.

JUSTICE KEENAN, with whom JUSTICE HASSELL and JUSTICE KOONTZ join, dissenting.

I respectfully dissent. The different purposes and methodologies inherent in valuations made for tax purposes and those made for determining just compensation undermine the validity of using one type of valuation as evidence to impeach

6

an expert witness's testimony regarding the other type of valuation.

Generally, the credibility of a witness may be impeached by showing that the witness made statements on a prior occasion that are inconsistent with his present testimony.  Breeden v. Roberts, 258 Va. 411, 415-16, 518 S.E.2d 834, 837 (1999); Commercial Distributors, Inc. v. Blankenship, 240 Va. 382, 394, 397 S.E.2d 840, 847 (1990); Neblett v. Hunter, 207 Va. 335, 340, 150 S.E.2d 115, 119 (1966).  Thus, the evidentiary issue before this Court is whether the prior valuation of the Russells' land made for tax assessment purposes presented an inconsistency bearing on the credibility of Stacy's valuation testimony at trial.

This Court has recognized that the purpose of tax assessment valuations is to equalize the taxation burden among landowners.  Norfolk & W. Ry. Co. v. Commonwealth, 211 Va. 692, 695, 179 S.E.2d 623, 625 (1971); Southern Ry. Co. v. Commonwealth, 211 Va. 210, 214, 176 S.E.2d 578, 581 (1970).  We have enforced this principle by requiring uniformity in the mode of assessment and in the rate of taxation.  Id.  We have stated that it is not important whether a tax assessment is high or low, as long as the assessment is uniform and made in accordance with the methods of valuation adopted in the taxing district as a whole.  City of Roanoke v. Gibson, 161 Va. 342, 347, 170 S.E.

7

723, 725 (1933).  Thus, the essential characteristic of valuations made to determine tax assessments is the setting of uniform, rather than exact, values of the properties to be assessed.

In contrast, when land has been condemned, the purpose of determining fair market value of the condemned property is to compensate the landowners fully for the value of what they have lost.  It is well settled that "just compensation" is the fair market value of the property at the time of the taking, based on the "most advantageous and valuable use" or the "highest and best use" of the land.  Lynch v. Commonwealth Transp. Comm'r, 247 Va. 388, 391, 393, 442 S.E.2d 388, 389, 391 (1994); Appalachian Power Co. v. Anderson, 212 Va. 705, 708, 187 S.E.2d 148, 152 (1972); Appalachian Elec. Power Co. v. Gorman, 191 Va. 344, 354, 61 S.E.2d 33, 38 (1950).  The landowner is entitled to compensation that is the "full and perfect equivalent" for the property.  Appalachian Power Co. v. Anderson, 212 Va. at 708, 187 S.E.2d at 152; Gorman, 191 Va. at 354, 61 S.E.2d at 38; Anderson v. Chesapeake Ferry Co., 186 Va. 481, 490, 43 S.E.2d 10, 15 (1947).  Therefore, the essential characteristic of valuations made to determine just compensation is the setting of exact values rather than values that are uniform and proportional to the values of any other properties.

While Article X, Section 2, of the Constitution of Virginia and Code § 58.1-3201 require that tax assessments be made at fair market value, this requirement does not render the two types of valuations analogous. Article X, Section 1 of the Constitution of Virginia provides that all property taxes "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." The dominant purpose of Sections 1 and 2, construed together, is to distribute the burden of taxation evenly and equitably, in so far as is practical. Board of Supervisors v. Telecommunications Indus., Inc., 246 Va. 472, 477, 436 S.E.2d 442, 445 (1993); R. Cross, Inc. v. City of Newport News, 217 Va. 202, 207, 228 S.E.2d 113, 117 (1976); Smith v. City of Covington, 205 Va. 104, 108, 135 S.E.2d 220, 222-23 (1964); Skyline Swannanoa v. Nelson County, 186 Va. 878, 881, 44 S.E.2d 437, 439 (1947). If it is impractical or impossible to enforce both the standard of fair market value and the standard of uniformity and equality, the standard of uniformity and equality must be preferred as the just and ultimate end to be attained. Id.

In a condemnation proceeding, however, the standard of fair market value does not yield to any other principle. An expert appraiser's determination is bound by fixed considerations such as the availability and suitability of the land for all legitimate uses, considering the existing business demands of

9

the community or such demands that may reasonably be expected in the near future. See Lynch, 247 Va. at 391, 442 S.E.2d at 389-90; Anderson, 212 Va. at 708, 187 S.E.2d at 152; Gorman, 191 Va. at 354, 61 S.E.2d at 38. These and other considerations relating to the fair market value of the property are not affected by concerns for uniformity and equality.

Therefore, I would conclude that, based on these different purposes and methodologies, evidence of a valuation made for tax assessment purposes does not present an inconsistency bearing on the credibility of an expert witness who valued the property at a different amount for purposes of determining just compensation in a condemnation proceeding. This conclusion is not altered by the fact that in the present case the same person made both valuations. The differing nature of the two types of valuations, not the possibility of different appraisers, creates the disparity that undermines the validity of using one type of valuation as impeachment evidence to challenge the credibility of an expert's testimony concerning the other type of valuation. Thus, I would hold that in a condemnation proceeding, evidence of a valuation made to determine a tax assessment is generally inadmissible to impeach the testimony of an expert witness regarding his valuation of the property for purposes of determining just compensation. Accordingly, I would conclude

10

that the trial court erred in allowing the disputed impeachment evidence.